STATE of Delaware,

v.

**Paul HARRIS, Defendant.**

No. 9511000916.

Superior Court of Delaware,
New Castle County.

Submitted: April 6, 1998.

Decided: July 23, 1998.

Cynthia Kelsey, Deputy Attorney General, Wilmington, for the State.

Thomas A. Foley, Wilmington, for Defendant.

### MEMORANDUM OPINION

ALFORD, J.

On this 23rd day of July, 1998, having read and considered Paul Harris'("Defendant") Motion to Suppress filed in this

Court on March 3, 1998 and having heard arguments by Counsel in a hearing held on April 6, 1998, it appears to the Court that:

The issue before the Court is one of first impression. The Court must decide whether probation officers exceeded the scope of an administrative search of a probationer's residence pursuant to procedures promulgated by the Department of Corrections (hereinafter "Department"). During the hearing the Court heard testimony from officials who participated in the search and events leading to its execution.

The facts relative to this Motion are largely undisputed. During the course of an administrative search of Defendant's residence, probation officers found ammunition and small plastic bags used for cocaine in a linen closet, and a small plastic bottle containing cocaine and drug paraphernalia in a crawl space located beyond a trap door above the linen closet. The seized contraband forms the basis of an indictment and Defendant's Motion.[1]

While serving a probationary sentence in November 1995, Defendant resided with Michael Porter ("Porter") at Porter's home located at 2412 West Second Street, Wilmington, Delaware. Porter was also serving a probationary sentence. Probation officers wanted to perform an administrative search of Porter's residence because there was suspicion that Porter was involved in illegal drug activities. Porter was the target of the administrative search.

Wilmington Police Officer Lawrence Collins ("Collins"), who is a twenty-year veteran of the Wilmington Police Department, is employed by the Department of Corrections, Probation and Parole. At the time of the events in question, Officer Collins was assigned to the Career Criminal Unit where he worked two days per week. He also worked on an Alcohol Tobacco and Firearms task force three days per week. At no time was Collins assigned as the supervising probation officer for Defendant or Porter.

Approximately one week prior to the search, Probation Officer Michelle Yadlosky ("Yadlosky") and former Probation Officer Kevin James contacted Collins to determine if Collins knew of any open investigations in connection with Porter's residence. Officer James was Porter's probation officer at the time. Collins then contacted Sergeant Wright ("Wright") of the Wilmington Police to determine whether any officers had any information concerning possible drug sales at 2412 West Second Street. At some point prior to the execution of the search, Sergeant Wright spoke to Detective Brian Cross ("Cross"), also of the Wilmington Police Department. Detective Cross was unaware of any investigation involving 2412 West Second Street at that time. However, a few days after Collins' initial telephone call, Cross telephoned Collins and informed him that he had received a telephone call from a concerned citizen who believed that there was drug related activity at that address.

Officer Collins had considerable experience conducting residential searches in his prior career as a police officer. Collins testified that according to Probation and Parole rules, a probation officer is supposed to have some independent knowledge that there is criminal activity or a violation of probation being committed at a particular location before conducting a search. Probation officers are also required to articulate to their supervisor why a search is necessary and receive a supervisor's approval prior to conducting the search. Police officers are not to take an active role in the search, but are present for security reasons. Probation officers are permitted to enter the home and search the common areas and living areas of the residence. In Collins' opinion, this

---

1. Defendant was granted a new trial on the charges in the indictment because prejudicial testimony was introduced in error at his first trial. Therefore, this pre-trial Motion was filed in anticipation of Defendant's new trial.

would include living rooms, kitchens, an individual's bedroom, and depending on what is found, if anything, the scope of the search may broaden. Collins testified that a basement or an attic are common areas, so long as there are no locks or similar devices to prevent another occupant from having access. According to Collins, when a residence is occupied by two individuals who are subject to probation and parole, the entire house in considered a common area.

On November 2, 1995, Detective Cross and probation Officers Collins, Wright and Baker waited outside for Defendant and Porter to exit the residence. According to Collins, he and Baker did not knock on the door because probationers usually don't answer and probation officers lack the authority to force entry into a probationer's home. Meanwhile, Detective Cross and Sergeant Wright waited in a vehicle further down the street. Immediately after Defendant and Porter exited the residence, they were handcuffed because the officers believed both men looked "concerned." Handcuffing probationers was said to be routine procedure for safety reasons. Collins did not know which of the men was Porter or Harris, but informed both men that their probation officers would be right there to see them. Defendant's and Porter's probation officers arrived at the scene shortly afterwards. Collins and Baker did not enter the residence until probation Officers Yadlosky and James arrived.

During the search there were approximately ten officials inside the residence, including police Officer Dempsey and probation Officers Collins, Baker, Cross, Yadlosky, and Michael Cocuzza, Defendant's supervising probation officer. None of the Wilmington police officers that were present actively participated in the actual search of the premises. Collins searched the cushion of a love seat in Porter's bedroom where he seized a 0.25 caliber semiautomatic handgun with an obliterated serial number. Officers Cocuzza, Yadlosky and Baker searched the hallway linen closet where a box of bullets and small bags used for drugs were found. The probation officers noticed a foot impression on one of the shelves and, as a result, went inside a trap door and searched the crawl space which was located above the shelves in the linen closet.

Detective Cross testified at the hearing. Days before the search, he received an anonymous telephone call from someone who resided in the same block as Defendant. The caller believed that there was drug activity occurring at Defendant's residence because there were numerous people going in and out of the house at all times of the day. The caller also noted that the two black male residents did not appear to be employed because they were home most of the time. Thereafter, Detective Cross made a surveillance of the house and noticed a gold BMW and blue Honda parked nearby. He ran the tag on the Honda and learned that it was registered to Sonya O'Neill, who also resided at 2412 West Second Street. Cross testified that he did not know if the BMW belonged to someone residing at that address, and that his surveillance of the residence consisted of a couple of drive-bys.

On cross-examination, Cross admitted that he lacked sufficient information to obtain a search warrant. He went to the West Second Street address on the day of the search only after learning from Collins that probation and parole officers wanted to conduct an administrative search. Cross admitted that he had never seen Defendant or Porter before, did not know who they were when they were handcuffed, and that he made a fair presumption that the men exiting the house were Defendant and Porter. Defendant and Porter were positively identified after they were handcuffed and subsequently questioned.

During the hearing, the Court heard conflicting testimony. On direct examination Officer Collins testified that he and other vice officers waited about one-half

hour to forty-five minutes before the probationers exited the residence. On cross-examination Detective Cross testified that police officers confronted Defendant and Porter, rather than the probation officers, only because they arrived first at the scene. Probation Officer Cocuzza later testified that he waited at 1601 North Pine Street for Collins to call "us."[2] The Court accepts the testimony of Probation Officers Cocuzza and Collins as fact.

Cocuzza had been Defendant's probation officer since August 22, 1995. Prior to Cocuzza's supervision, Officer Ferreira was Defendant's probation officer. Cocuzza learned from Kevin James, Porter's probation officer at the time, that Defendant was living with Porter, had been seen driving a BMW, and had missed counseling appointments. Other officers reported that there appeared to be frequent traffic in and out of the residence. Cocuzza was aware of Defendant's record for selling drugs. Although he had never observed Defendant driving the BMW, he had observed expensive items during previous visits to the residence. Based on said information, he coordinated his efforts with Officer James, and it was decided that an administrative search be conducted. At that time, Cocuzza had received training but had little experience conducting administrative searches. For that reason his supervisor, after approving the search, coordinated Collins' involvement because of his experience.

The United States Supreme Court addressed the issue of whether a search of a probationer's home violated the Fourth Amendment of the United States Constitution in *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). In *Griffin*, the defendant's probation officer received information from a detective that there might have been guns in Griffin's apartment. The defendant's own probation officer was not available to perform the search. Accompanied by three plain-clothes police officers, the supervisor of Griffin's probation officer executed the search. Once the defendant opened the door, the supervisor identified himself and informed the defendant that there was going to be a search of his home. The actual search was conducted entirely by probation officers. The Court in *Griffin* held that the search of the probationer's residence "was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." *Griffin*, 483 U.S. at 880, 107 S.Ct. 3164 (emphasis in original). The Court expressly declined to consider whether any search of a probationer's home by a probation officer is lawful when there are reasonable grounds to believe that contraband is present. *Id.* Here, the Court must determine whether the search was conducted pursuant to regulations as provided by the Department.[3]

The Department promulgated Procedure Number 7.19 (hereinafter "Procedure") under the authority of Title 11, Section 4321 of the Delaware Code, as amended. Its purpose is "[t]o establish procedures for when and how a search of a[sic] offender or the offender's living quarters or property might properly be conducted." When a search of a probationer's home is contemplated, the following apply:

IV. Definitions:

. . .

B. A search of the offender's living quarters, which should generally be confined to areas actually occupied by the offender, and which would include common area such as kitchen, bathroom, living room, etc. and the offender's property, i.e. automobile.

The Guidelines, section V.B. of the Procedure, provide *inter alia*,

---

**2.** It is presumed "us" refers to Kevin James and several other unnamed probation officers.

**3.** The validity of the Department's regulations are not in question, and therefore, are presumed valid.

1. Before any search is conducted, Officers must first have the approval of a supervisor or designee, unless emergency circumstances dictate otherwise. The Pre–Search Checklist will be used to assist in the decision making process.

. . .

3. Officers should seek the assistance of other law enforcement officials when conducting a search of living quarters or property. This is to provide security only and they should not assist in the search.

4. Searches should never be made solely on the basis of a request from law enforcement officials, but should be the decision of the Officer.

5. Officers will strive to preserve the dignity of offenders in all searches conducted.

6. Whenever feasible, before a search is conducted, the offender should be informed that a search is about to occur, its location, and why the search is being conducted.

7. Generally, if the offender whose living quarters or property is being searched is not present, the Officer should not enter the premises. A search should be conducted in the presence of an officer or other law enforcement officers.

8. In conducting searches, Officers shall disturb the effects of the offender as little as possible. Care should be taken to prevent infringement on the rights of other occupants of the dwelling.

. . .

11. Officers who conduct the search should at minimum, have received agency training as to these procedures as well as methods and techniques involved in conducting personal and living quarter searches.

. . .

13. After the search has been conducted, a written report will be made . . . . A copy of this form should be filed in the case folder of the offender for whom the search was conducted. . . . A copy of the Pre Search Checklist will be submitted with the arrest/incident report.

■■■ In deciding whether there are reasonable grounds to believe a offender is violating conditions of supervision, possesses contraband, or that an offender's living quarters or property contains contraband, Procedure 7.19 requires Officers to consider: (1) observations by a staff member; (2) information provided by an informant; (3) the reliability of the information; (4) the reliability of the informant; (5) the activity of an offender that indicates the offender might possess contraband; (6) information provided by the offender which is relevant to whether the offender possesses contraband; (7) experiences of probation officers with an offender; (8) prior seizures of contraband from an offender; (9) whether the offender has signed Conditions of Supervision; and finally, (10) the offender's prior conviction pattern. As stated in *Griffin,* a State's operation of a probation system, like its operation of a school government office or prison, or its supervision of a regulated industry, presents special needs that may justify departure from warrant and probable cause requirements. *Griffin v. Wisconsin,* 483 U.S. 868, 873–74, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). Probation is a form of criminal sanction. *Id.* Probationers do not enjoy "the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Id.* at 874, 107 S.Ct. 3164 (brackets in original) (citing *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large. *Griffin,* 483 U.S. at 875, 107 S.Ct. 3164. "Supervision,

then, is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id.* (emphasis in original). The Supreme Court in *Griffin* stated, however, that the permissible degree is not unlimited. *Id.*

■ The Court first addresses whether there was a reasonable basis to conduct a search of Defendant's residence in light of guidelines relating to the Procedure. Defendant's probation officer had observed expensive items in Defendant's home; knew that Defendant lived with another probationer; that expensive vehicles were observed in the area of Defendant's residence; and knew that Defendant missed counseling appointments. Detective Brian Cross received information from a concerned neighbor that there was excessive activity at Defendant's residence. He later shared that information with probation and parole officers. Cocuzza had reason to believe such information reliable. Based on his experiences, albeit limited at the time, and his knowledge of Defendant's record for selling drugs, Cocuzza reasonably believed Defendant was engaged in illegal activity again. Thus, the Court finds that the facts and circumstances sufficed to provide reasonable grounds, as required by the Procedure 7.19, to believe that Defendant was violating the conditions of probation.

■ Having found so, the Court now decides whether the administrative search exceeded the scope of Procedure 7.19. Failure to comply with procedures, which are presumptively valid, would violate the "reasonableness" requirement within the meaning of the Fourth Amendment of the United States and would warrant granting Defendant's Motion to Suppress. The Court first notes that Procedure 7.19 does not provide an exclusive list of areas within a probationer's dwelling that may be searched. Therefore, the Court is required to examine the instant case in light of the facts and circumstances presented. In doing so, the Court looks to the other jurisdictions where similar issues were raised.

"In a case of a shared residence, the probation officer's search may extend to all areas of the residence over which the probationer has control, even if that control is not exclusive. This includes common areas of the residence. Therefore, the probation officer may search the areas of the house and items of property within the house to the extent that the officer has reason to believe that the area or item searched is owned, possessed, or controlled by the probationer—even if it later turns out that the area or item searched was in the exclusive possession of the homeowner."

*Milton v. Alaska*, Alaska Ct.App., 879 P.2d 1031 (1994).

All of the Guidelines are relevant to a Living Quarters and Property Search except Guideline 2, which pertains to Personal Searches only. Essentially, Defendant's Motion contests the execution of the search with respect to Guidelines 1, 3, 4, 6, 11. The Court is satisfied that probation officers fulfilled the requirements of the Guidelines.

■ With respect to Guidelines 1, 3, 4, and 11, Probation officers: (i) received a supervisor's approval to conduct the search; (ii) sought the assistance of law enforcement officials; (iii) did not decide to search on the basis of a request from law enforcement officials; and (iv) conducted the search armed with the requisite training. Corroborated testimony at the hearing indicated that Porter, the main target of the search and the principle occupant of the residence, was present when officials entered the premises. Although police officers lacked probable cause upon which they could obtain a search warrant, it did not defeat the Department's authority to execute an administrative search based upon reasonable grounds and in compliance with Procedure 7.19. *See New Hampshire v. Zeta Chi Fraternity*, 142 N.H. 16, 696 A.2d 530, 542 (1997), *cert.*

*denied,* —— U.S. ——, 118 S.Ct. 558, 139 L.Ed.2d 400 (1997). As for Guidelines 6, the Court gives it separate and adequate consideration.

█ It is first necessary to determine whether the activity that occurred was a "Living Quarters and Property Search" as defined in the Procedure. The evidence that forms the basis of Defendant's Motion to Suppress was found in the linen closet. Defendant argues that such an area can not actually be occupied by the Defendant, and therefore, is not within the scope of the Procedures. The Court agrees that a linen closet usually is not an area "actually occupied" by an offender, but does not agree that it is not a common area. The common areas listed in the Procedure are illustrative and are not exclusive. It is an area to which Defendant had some control. *See Milton,* Alaska Ct.App., 879 P.2d 1031 (1994). Therefore, the Court does not agree with Defendant's substantive argument. Further, it must be borne in mind that language "actually occupied" and "common area" appear only in section IV.B. Definitions of the Procedure. It is not meant to provide instructions for implementing the search. Those instructions are enumerated in Section V.C. of the Procedure. The language in Section IV.B. is meant to distinguish a search of an offender's residence from a search of an offender's person. The Court concludes that the language defines the type of search a probation officer may conduct, and is not intended to define the absolute outer limits of its scope. The language "should generally be confined to areas ..." would be quite vague if it were intended to define the limits of an administrative search of a probationer's home.

█ The Court now turns to Guideline 6. That guideline states that offenders should be informed that a search is about to occur whenever feasible. On its face, the guideline would seem to be counterproductive when the facts are as presented in this case. After all, if a probationer would have notice of every occasion that a super-vising officer was going to conduct an administrative search, his failure to observe the terms of his probation would remain concealed and his involvement in other illegal and socially dangerous activities would go undetected and uncorrected. *Griffin,* 483 U.S. 868, 878, 107 S.Ct. 3164, 97 L.Ed.2d 709. It is in that light that the Court assesses the facts and circumstances in determining whether it was feasible to inform Defendant of the search prior to its occurrence. Notice of a visit may benefit the probationer. In such situations, the opportunity avails for the probationer to communicate to his supervising officer those problems which might interfere with rehabilitation and a successful term of conditional liberty. The Court is aware that on this occasion the concerted effort of law enforcement officials and probation officers was not the uneventful routine visit to Defendant's residence. At the outset, officials planned to wait for the men to exit the residence, take them into custody for safety reasons, and follow through with a search of the residence for contraband. Notice in this instance, was not feasible. It would have only had the effect of permitting the probationers to conceal the contraband.

Therefore, the Court concludes that probation officers followed the established Procedure and complied with the necessary Guidelines upon conducting an administrative search of Defendant's residence.

For all of the foregoing reasons, the Defendant's Motion is hereby **DENIED**.

**IT IS SO ORDERED**.