897 A.2d 276

Christopher Robert VOLKOMER

v.

STATE of Maryland.

No. 2130, Sept. Term, 2004.

Court of Special Appeals of Maryland.

April 27, 2006.

Renee M. Hutchins, Ademuyiwa Bamiduro (Michael Millemann, on the brief), Baltimore, for appellant.

Gregory D'alesandro (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: SALMON, KENNEY and THEODORE G. BLOOM (Retired, specially assigned), JJ.

KENNEY, J.

Christopher Robert Volkomer appeals the denial of his motion to suppress evidence allegedly obtained in violation of his Fourth Amendment rights. He presents two questions for our review, which we have reworded as follows:

I. Did the circuit court err in finding that the State had satisfied its burden of establishing that evidence found during the execution of a search warrant was legally obtained?

II. Did the circuit court err in finding that a warrantless intrusion of appellant's home by Delaware probation officers was a lawful "home visit" and that incriminating evidence observed during the home visit was admissible under the "plain view" doctrine?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

Appellant was charged in the Circuit Court for Caroline County with three counts of second degree burglary, three counts of fourth degree theft, two counts of theft of property having a value greater than $500, and three counts of theft of property having a value less than $500. Appellant moved to suppress evidence obtained from his home and vehicle following the execution of a search warrant by the Delaware State Police. He also sought to suppress inculpatory statements made by himself, his wife, and two associates.

At the hearing on appellant's motion, Sergeant Carsten Wendlandt of the Wicomico County Sheriff's Office testified that, on October 9, 2002, he received a report that the Winterplace Animal Hospital in Salisbury, Maryland had been burglarized. Sergeant Wendlandt spoke with the owner or operator of the business, Ms. Clark, who informed him that she witnessed a suspicious man peering into the windows of the office the evening before. Clark had written down the tag number of the man's vehicle. The vehicle was registered in Delaware to appellant and his wife, Emma Volkomer. Sometime during the week ending October 19, 2002, Sergeant Wendlandt showed Clark a photographic array that included appellant's picture. Although she "got a good look," Clark was unable to identify appellant as the man she saw on October 8, 2002.

Detective William Porter, a Delaware State Police Officer, informed Sergeant Wendlandt that the address listed on the vehicle registration was outdated and that the Volkomers' current address was "7489 Canterberry Road" in Felton, Delaware. On October 14, 2002, Sergeant Wendlandt, accompanied by another officer, went to the Felton address to verify that it was a residence.

On October 18, 2002, Sergeant Wendlandt was contacted by Detective Porter, who was preparing a warrant to search

appellant's home and vehicles for veterinary medicine. Sergeant Wendlandt did not remember whether he had shown Clark the photo array before the conversation with Detective Porter, but he testified that if he had done so, he would have informed Detective Porter that Clark was unable to identify appellant as the man she saw the night before the break-in. After speaking with Detective Porter, Sergeant Wendlandt went to appellant's home. He "assist[ed]" the Delaware State Police in executing the search warrant, but did not personally seize any items.

Detective Porter testified that Sergeant Wendlandt contacted him after the October 9, 2002 burglary of the Winterplace Animal Hospital. Sergeant Wendlandt relayed the tag number recorded by Clark. An investigation revealed that the vehicle was registered to appellant and Emma Volkomer.

According to Detective Porter, the Delaware State Police had an agreement with Delaware Probation and Parole officers, whereby Delaware state troopers would report "tips" that a probationer or parolee was suspected of violating the terms of his or her probation or parole or otherwise suspected of involvement in criminal activity. The state police officers would then accompany the probation and parole officers on "searches" of the probationer's home. The Delaware State Police did this "on numerous occasions" because "[i]t's just easier using them than ... typing up a search warrant and that takes a couple of hours to do something like that when you can just get on the phone and call the probation officer and if the person's on probation they're allowed to go."

When Detective Porter checked to determine whether appellant was on probation or parole, he discovered that both appellant and Emma Volkomer were on probation. On October 18, 2002, Detective Porter contacted Thomas Webster, a Delaware State Probation and Parole Officer. He informed Officer Webster that appellant was a suspect in the Winterplace Animal Hospital burglary, and asked to accompany Officer Webster on a "search" of appellant's home. Officer Webster agreed and met Detective Porter at appellant's home

between 1:15 p.m. and 1:30 p.m. In total, four law enforcement officers were present; two Delaware State Police detectives, Porter and Durham, and two Delaware State probation and parole officers, Webster and Thompson. All of the officers entered appellant's house.

Officers Webster and Thompson looked through the household, while Detective Porter "followed them and . . . observed what they opened and looked in." When questioned about the scope of the "search," Detective Porter testified, "I think they [, the probation officers,] looked in ah, closets ah, I believe and I believe they opened up ah, cupboards and drawers. I think so, I don't. . . ." Detective Porter recalled that appellant remained seated in the living room. He could not remember whether Emma Volkomer escorted the officers around the house. The probation and parole officers "searched" for approximately twenty-five to thirty minutes, but nothing inside was seized.

After all of the officers had exited appellant's home and were preparing to depart, Detective Porter observed a see-through "Walmart bag" containing "numerous [identical] boxes," "underneath the foundation of the house." Because it appeared "strange," he "pointed this bag out to one of the probation officers." Detective Porter testified, "I think it was [Officer] Webster and ah, [I] gave him the bag and he looked in the bag." Inside the bag, the officers found "ketamine drugs," a "veterinary animal medication." Appellant and Emma Volkomer were immediately arrested.

Following appellant's arrest, Detective Porter applied for a warrant to search appellant's home and vehicles. In support of the warrant application, Detective Porter described the initial intrusion into appellant's home as an "administrative search." After securing a warrant, Detective Porter returned to appellant's home between three and four hours after he was arrested. During the subsequent search, seven items were seized. Relevant to this case, the items included a box recovered from appellant's vehicle that contained "costume jewelry . . . and some little trinkets," which still had price tags

attached. The attached price tags "stood out" to Detective Porter because he thought that a merchant would have removed them after selling the items.

Detective Porter also discovered a business card in the bottom of the box. When he called the phone number on the card, he learned that "a little antique strip mall in Caroline County ... had been burglarized." Detective Porter related his discovery to the Caroline County Sheriff's Department.

Officer Webster was the next witness to testify. In October 2002, he was a probation and parole supervisor for Emma Volkomer. On the morning of October 18, 2002, he received a phone call from Detective Porter, informing him "that the Volkomers were suspects in a burglary." Appellant's probation supervisor was not present, but Officer Webster also reviewed appellant's file. Officer Webster did not complete the "administrative search" form required to search a probationer's home because "there was no [administrative] search, it was a home visit."

Officer Webster arrived at appellant's home at approximately 1:30 p.m. on October 18, 2002. He intended "[t]o walk through during a home visit and to verify if anything [Detective Porter] said was corr[ect]." He requested that Detective Porter accompany him "as security." Officer Webster did not inform the Volkomers that he was coming because a home visit, unlike an administrative search, did not require prior notice.

Officer Webster knocked on appellant's door and was greeted by Emma Volkomer. He informed her who he was and that he was there to conduct a home visit. Emma Volkomer gave Officer Webster a tour of the home; Detective Porter followed. The officers walked through appellant's home for approximately fifteen to twenty minutes. Officer Webster did not recall opening any doors, closets, or cupboards.

Upon exiting appellant's home and walking to his vehicle, Officer Webster, along with Detective Porter, observed a "Walmart bag or a clear plastic bag like you would get in a store. With boxes in it." As he walked closer to the bag,

Officer Webster could see boxes through the bag that were labeled "ketamine," one of the drugs that had been taken during the burglary of the Winterplace Animal Hospital. Officer Webster believed that he picked up the bag before Detective Porter did. He could clearly read the labels on the boxes inside before moving, or looking inside of, the bag. Upon discovery of the ketamine, Officer Webster arrested appellant for "violation of probation" and Emma Volkomer for "breach of release."

During cross-examination, Officer Webster explained that he performs approximately thirty home visits per week. In a typical home visit, he requests the probationer to "show [Officer Webster] around his house, show . . . his refrigerator, that . . . kind of stuff." He is permitted to "touch stuff" and may request probationers to open doors, drawers, and closets. To perform a more intrusive "administrative search," he must obtain prior approval from his superiors. Generally, and at a minimum, reasonable suspicion that the probationer is violating the terms of probation is required to conduct an administrative search.

Officer Webster reiterated his intention on October 18, 2002, to perform a home visit, not an administrative search. In addition, prior to discovering the bag of ketamine, he was prepared to "say good-bye" to the Volkomers, but possibly urine test them for drugs at their next regularly scheduled meeting.

Appellant also testified. In October 2002, he was on probation for one count of carrying a concealed weapon and one count of aggravated menacing. He had signed two "Conditions of Supervision" agreements, consenting to be "subject to arrest and to a search of [his] living quarters, person or vehicle without a warrant at any time by a probation/parole officer." He did so because he had "a choice of being in jail away from everything or being on the street, . . . as far as [he][was] concerned it wasn't a choice."

On October 18, 2002, he woke up to four officers knocking on his door. He sat in the living room, where he "th[ought]"

he "heard [Officer Webster] say we're here to do an administrative search." According to appellant, the officers requested Emma Volkomer to escort them around the home and "order[ed] her to open up cabinets and ... a little cupboard underneath the stairs ... they didn't like lift the couch up and look under stuff like that, but they were searching through stuff...." When the officers went outside, he became worried they would find the "bag of drugs" he secreted "beneath the foundation the night before." When the bag was discovered, he admitted the drugs were his.

The State called Detective Phil Dixon, a member of the Caroline County Sheriff's Department, as its sole rebuttal witness. Detective Dixon testified that, on September 20, 2002, the Denton Station Antiques Mall was burglarized, resulting in the theft of more than $5,000 worth of silver, glass items, and costume jewelry. The night prior to the break-in, the manager observed "[two] white males and two young white females" approach the business "right at closing time." The two males walked around the back of the building, before returning to their "greenish, turquoise colored" vehicle with Delaware registration.

On November 13, 2002, Sergeant Ronald Dixon of the Caroline County Sheriff's Department,[1] was contacted by Detective Porter, who inquired about the Caroline County Sheriff's Department's investigation of an antique store burglary. During the October 18, 2002 search of appellant's home and vehicles, Detective Porter had discovered a business card for "Rosie's Past and Present" in the box of antique items.

Sergeant Dixon contacted the owner, Rose Mulligan, who confirmed that her business "had items inside the Denton [Station] Antique[s] Mall that were stolen." Mulligan's description of the items, including the "little [numbered] tags," matched items recovered from appellant's vehicle on October

---

1. Sergeant Ronald Dixon did not testify at the suppression hearing. After he spoke with Detective Porter, he made a brief investigation. The primary investigator of the Denton Station Antiques Mall burglary was Detective Porter.

18, 2002. Several days later, Detective Porter gave the recovered box and its contents to Detective Phil Dixon. When Detective Dixon showed Mulligan the items, she confirmed that some of the items were hers.

On January 2, 2003, Detective Dixon visited appellant, who was incarcerated in Delaware. After advising appellant of his Miranda rights and obtaining appellant's written waiver of those rights, Detective Dixon questioned appellant concerning the burglary of the Denton Station Antiques Mall. At first, appellant denied any knowledge of the burglary. He then stated, "just because Detective Porter got that stuff from my house, it's not enough to convict me.... [H]e might get me with being in possession of stolen goods, but that's better than burglary."

At the conclusion of the interview, appellant instructed Detective Dixon to tell his co-worker "that he was about six or eight feet from a good collar." Detective Dixon interpreted appellant's comment as an admission that he was present when a member of the Caroline County Sheriff's Department responded to the alarm at the Denton Station Antique Mall on September 19, 2002. Appellant then stated that he would tell Detective Dixon everything he knew about the robbery if Detective Dixon would arrange for appellant to have a phone conversation with Emma Volkomer. When Detective Dixon informed appellant that he could not arrange such a phone call, the interview ended.

Detective Dixon interviewed Emma Volkomer at the Wicomico County Detention Center on April 15, 2003. She made a statement implicating appellant and two other individuals, Eric Myers and Sheena Eastridge, in the Denton Station Antiques Mall burglary. She said that the participants used false names to purchase "walkie talkies" from a store. Detective Dixon "tracked down the sales receipts for those items."

He then spoke with Myers, who admitted that he and appellant "were the primary persons that entered the [Denton Station Antiques Mall] and stole silver and other items that were missing." Detective Dixon also questioned Eastridge,

who initially denied any knowledge or participation in the burglary. Eastridge later confessed her complicity in the burglary to Detective Porter.

During cross-examination, Detective Dixon agreed that he "would never have had [appellant] as a suspect in the [Denton Station Antiques Mall burglary] case," but for the call from Detective Porter.

Following the close of evidence, appellant argued that the initial visit was, in fact, an "administrative search," conducted in violation of his Fourth Amendment Rights. Because the officers were not legally present at his home, their discovery of the bag of ketamine did not fall within the plain view exception to the Fourth Amendment. Therefore, the evidence upon which the search warrant was secured was illegally obtained, and all of the evidence obtained as a consequence of that search, including the box of stolen items, the receipts for the "walkie talkies," and the inculpatory statements from appellant, Emma Volkomer, Myers, and Eastridge should be suppressed as fruit of the poisonous tree.

The State countered that the bag of ketamine was discovered, in plain view, during a lawful "home visit." Therefore, the search warrant was issued based upon legally obtained evidence and all of the evidence was admissible.

On September 10, 2004, the circuit court issued an order denying appellant's motion to suppress. In its memorandum opinion, the court credited Officer Webster's testimony that the intrusion into appellant's home on October 18, 2002, was a "home visit," and not an "administrative search." The court stated, in relevant part:

The Delaware Department of Corrections has promulgated rules governing administrative searches of probationers['] homes. An administrative search of a probationer's home can be a full search for named items conducted by Parole & Probation Officers rather than police officers. The [Superior] [C]ourt [of Delaware] in *State v. Harris*, 734 A.2d 629 (1998), suggested that if Parole & Probation officers do not comply with the Delaware Department of Corrections' rules

governing such administrative searches, evidence seized in violation thereof might be suppressed.

The only suggestion that this was not a home visit but an administrative search comes from [appellant's] characterization of it. The testimony of [Officer] Webster, who conducted it, was that it was not an administrative search. He said if it had been, he would have followed the procedures requiring him to seek his supervisor's approval and he did not do so. In addition, the evidence is that the intrusion was short in time and limited in scope. [Officer] Webster told [appellant] and his wife that he wanted them to "show him their home," not that he was there searching for anything in particular or in general. The fact that a police officer (Detective Porter) accompanied [Officer] Webster does not make it any more of an administrative search than it does a home visit. Police assistance is a matter of policy and procedure in either instance.

A provision of the probation forms signed by both [appellant] and his wife allows home visits, unannounced. Delaware Parole & Probation policy is that officers should be accompanied by an officer from the jurisdiction in which the home visit is being conducted. As Detective Porter was from the agency having jurisdiction, and was available, he accompanied [Officer] Webster and [Officer] Thompson on his home visit. [Officer] Webster testified that they arrived at the home, knocked at the door, and identified themselves. [Appellant's] wife was asked to show them around their house, which she did. [Officer] Webster testified that they did not open any doors, closets, cupboards or containers but they may have asked [appellant's] wife to do so for them. [Appellant] says they went through and into everything, but he remained downstairs and could only see them for a portion of their visit.

The home visit lasted approximately twenty (20) minutes. As the three officers were leaving, they noticed a transparent shopping or supermarket bag (hereinafter "Wal–Mart bag") in plain view beside the steps and partially under the foundation. [Officer Webster] said that without moving the

bag or taking out the contents, he could see it had numerous identical boxes in it, labeled as a type of veterinary medicine.... [Officer] Webster did not need to move or open the bag to identify the contents. [Appellant] and his wife admitted they had no prescription for the medication, so they were arrested, either for possession of prescription drugs without a prescription, or violation of probation, or both.

Affording full faith and credit to the search warrant issued by the Delaware court, the circuit court determined that the second search of appellant's home and vehicles was constitutional in both justification and scope. The court concluded that the evidence resulting from the second search was not subject to suppression as fruit of the poisonous tree.

Following the court's suppression decision, appellant pleaded "not guilty" to one count of Fourth Degree Burglary based on an agreed statement of facts. Given the interest in the agreed statement of facts at oral argument, we find it useful to describe the statement of facts as presented to the court in some detail.

The State explained that on September 20, 2002, Sergeant Nepert of the Caroline County Sheriff's Department was dispatched to the Denton Station Antiques Mall to investigate a reported breaking and entering. The Denton Station Antiques Mall is essentially a consignment shop with more than sixty vendors displaying items for sale. When he arrived, he noticed that three display units had been broken into. Two of the display cases belonged to Rose Mulligan. Through his investigation, Sergeant Nepert determined that the perpetrators had gained entry to the property by cutting a hole in a chain link fence in the back of the building and had entered the building through a window air conditioning unit. Inside, the perpetrators tampered with an alarm. The night before, Deputy Chuck Briggs had responded to an alarm at the location, but upon a cursory investigation, did not see anything unusual.

Barbara Coleman, the manager of the facility, informed Sergeant Nepert that, immediately before closing on the night before the burglary, she observed two white males and two white females, appearing to be in their early twenties. The two males walked around the back of the building. Coleman thought they had merely used the portable rest-room located there.

The investigation was turned over to Detective Philip Dixon. Mulligan and the other victims provided Detective Dixon with a description of the items taken during the break-in. He was unable to identify any likely suspects and the investigation soon went cold.

On November 13, 2002, Sergeant Ronald Dixon was contacted by Detective Porter, who "had been involved in an execution of a search and seizure warrant" at the Volkomers'. In executing the warrant, the officers discovered a box containing numerous items with white price tags and a business card for Rosie's Past and Present Antiques and Collectibles, Rose Mulligan's business. The recovered items matched the description of items taken during the burglary of the antique mall.

On January 2 or 3, 2003, Detective Dixon visited appellant while he was imprisoned in Smyrna, Delaware. After being advised of his Miranda Rights, appellant reportedly stated that "just because Detective Porter got that stuff from my house, is not enough to convict me. He might get me with being in possession of stolen goods, but that's better than burglary." Appellant also reportedly asked Detective Dixon why he should feel guilty for what he had done, after all "the land we live on was stolen from Indians." Moreover, appellant asked Detective Dixon whether the officer who had reported to the alarm at the Denton Station Antiques Mall wore eyeglasses, and knowing that Deputy Briggs did wear glasses, Detective Dixon responded affirmatively. Appellant smiled and stated, "[T]ell your buddy that he was about eight feet away from a good collar."

In April 2003, Detective Dixon interviewed Emma Volkomer, while she was imprisoned in Wicomico County. Emma Volkomer reported that she, appellant, Myers, and Eastridge had committed the burglary at the Denton Station Antiques Mall on September 19, 2002. The group had visited the store the night before. Later, they went to a RadioShack store in Milford, Delaware, where Myers, using the name Jason Smith, purchased two-way radios. On the night of the burglary, Emma Volkomer and Eastridge were positioned across the street from the Denton Station Antiques Mall, acting as lookouts. The women notified appellant and Myers when Deputy Briggs was coming. Deputy Briggs circled the property and left.

The group obtained bags "full of silver items and jewelry." Later, the silver was melted down. They attempted, unsuccessfully, to pawn it in Delaware.

Following Detective Dixon's conversation with Emma Volkomer, an arrest warrant was secured for Myers, who was extradited from Delaware to Maryland. After being advised of his Miranda Rights, Myers confessed to involvement in the Denton Station Antiques Mall burglary, reporting a similar version of events as Emma Volkomer. Myers discussed purchasing the radio headsets from RadioShack. He also explained that he and appellant had entered the Denton Station Antiques Mall "by pushing an air-conditioning unit through the wall and um, going in." When the alarm went off and Deputy Briggs arrived, appellant and Myers were hiding in the tall grass in the back, "only a few feet from him as he shined his light over the grassy area." When Deputy Briggs left, appellant and Myers fled, picking up Eastridge and Emma Volkomer along the way.

Detective Dixon went to the RadioShack in Milford, where he found records evidencing the sale of radio headsets under the names Jason Smith and Chris Roberts.

On the agreed statement of the facts, the circuit court found appellant guilty of fourth degree burglary and sentenced him

to a three-year term "consecutive to any and all outstanding and unserved sentences." This timely appeal followed.

## STANDARD OR REVIEW

When reviewing a denial of a motion to suppress under Maryland Rule 4–252, we are required to make an independent review of the legal questions presented at the suppression hearing by applying the law to the facts. *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086 (2002). We are limited to the record adduced at the suppression hearing. *State v. Carroll*, 383 Md. 438, 445, 859 A.2d 1138 (2004); *State v. Green*, 375 Md. 595, 607, 826 A.2d 486 (2003); *State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660 (2002); *Rowe v. State*, 363 Md. 424, 431–32, 769 A.2d 879 (2001).

We accept the suppression court's findings of first-level facts unless the findings are clearly erroneous, giving due regard to the court's opportunity to assess the credibility of witnesses. *Green*, 375 Md. at 607, 826 A.2d 486. "We view the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the prevailing party on the motion," in this case the State. *Laney v. State*, 379 Md. 522, 533, 842 A.2d 773 (2004). *See also Dashiell v. State*, 374 Md. 85, 93, 821 A.2d 372 (2003). In determining whether the action in question was proper, we "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Collins*, 367 Md. at 707, 790 A.2d 660.

## DISCUSSION

### I.

Relying primarily upon *Jones v. State*, 139 Md.App. 212, 775 A.2d 421 (2001), appellant contends that the circuit court erred in finding that the State had satisfied its burden of establishing, by a preponderance of the evidence, that the officers' initial entry into appellant's home "was a valid home visit [per Officer Webster's testimony] and not an unauthorized administrative search [per Detective Porter's testimony]." According

to appellant, the evidence "stood in equipose" and was, therefore, insufficient to satisfy the State's burden. In addition, the court erred in determining that the State had satisfied its burden of establishing that the officers' discovery of the bag of ketamine fell within the plain view exception to the Fourth Amendment's warrant requirement because the evidence adduced at the suppression hearing was "evenly balanced" on that issue.

Appellant asserts that the burden was on the State to prove by a preponderance of evidence that the evidence the State sought to introduce was obtained legally. We disagree. When the State seeks to introduce evidence obtained pursuant to a warrant, "there is a presumption that the warrant is valid[,]" and "[t]he burden of proof is allocated to the defendant to rebut that presumption by proving otherwise." *Fitzgerald v. State*, 153 Md.App. 601, 625, 837 A.2d 989 (2003). *See also Yeagy v. State*, 63 Md.App. 1, 7–8, 491 A.2d 1199 (1985) (noting that, where a defendant challenges a search warrant that was issued based upon a false statement by an affiant, the defendant must establish, by a preponderance of the evidence, that the false statement was made "intentionally or with reckless disregard to its accuracy"). The presumption that a search warrant is valid provides an incentive to police officers to seek judicial approval before effectuating a search. *Herbert v. State*, 136 Md.App. 458, 492, 766 A.2d 190 (2001) ("When the State has procured evidence of guilt by the favored and preferred modality of a warranted search, it is rewarded by a presumption of validity in favor of its warrant application.").

The evidence that the State sought to introduce included the box and its contents obtained during the execution of a search warrant by the Delaware State Police. Accordingly, the burden rested with appellant to establish, by a preponderance of the evidence, that the warrant was invalid. In attempting to do so, appellant claims that the initial intrusion by Parole and Probation Officers Webster and Thompson, accompanied by the Delaware State Police Officers, was illegal because the

probation officers did not abide by the administrative procedures established by the Delaware State Department of Corrections, Probation and Parole Division, for conducting an administrative search. Alternatively, he argues that the officers violated the scope of a home visit by moving or opening the bag under the foundation of his home and that the officers lacked probable cause to believe that the bag contained evidence of a crime.[2]

Because the burden rested with appellant to establish that the warrant was invalid, if the evidence was "in equipose," as appellant contends, we would hold that the warrant was procured upon legally obtained evidence. As we explained in *Jones,*

> The burden of proof on the merits at a suppression hearing is by a preponderance of the evidence.
>
> \* \* \*
>
> Therefore, when the court at a suppression hearing finds it more likely than not that evidence was obtained illegally, it should suppress the evidence. If, on the other hand, the court finds it more likely that the evidence was legally seized, it should deny the motion and allow the evidence to be introduced at trial. It is only when the court finds the evidence on each side of the issue to be equally persuasive

---

**2.** Appellant does not contend that the guidelines established by the Delaware State Department of Corrections, permitting probation officers to conduct "home visits" and "administrative searches" of a probationer's home, is unconstitutional. To the contrary, citing *Delaware v. Harris,* 734 A.2d 629 (Del.Super.Ct.1998), appellant acknowledges that Department of Correction Procedure Number 7.19 was established "[f]ollowing the guidelines set forth in *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)," in which the Supreme Court approved administrative searches and entries of a probationer's home, so long as the intrusion was conducted pursuant to a regulation that, in itself, satisfied the Fourth Amendment's reasonableness requirement. In his reply brief, appellant stated:

For the warrantless inspection of a probationer's home to be valid under Delaware law, it must be either a home visit or an authorized administrative search. The nature of both of these intrusions is clearly defined. A home visit amounts to a less intrusive and routine inspection of the probationer's residence.

that it must consider by which party the burden of proof is borne. *See* [Maryland Pattern Jury Instructions 1:7a (3d ed. 1993 & 2000 Supp.)]. ("If you believe that the evidence is evenly balanced on an issue, then your finding on that issue must be against the party who has the burden of proving it."). Unless the court finds the evidence to be in this state of equipose, the burden of proof has no effect on its disposition of its motion to suppress.

139 Md.App. at 227, 775 A.2d 421. *See also Fitzgerald,* 153 Md.App. at 625, 837 A.2d 989 ("Once a warrant is shown to exist, the State wins the nothing-to-nothing tie (or a tie at any other level). The allocation of the burden of proof is the law's tiebreaker.").

Nevertheless, we are not persuaded, as we explain in Part II, that the evidence relating to whether the initial intrusion was a home visit or an administrative search and whether Officer Webster saw that the bag contained ketamine before it was moved was "evenly balanced."

## II.

■ Appellant contends that the circuit court's factual findings were clearly erroneous. Specifically, appellant contends that the court erroneously "disregarded Detective Porter's testimony in its entirety, without offering any reason for doing so." Moreover, appellant argues that the circuit court erred in crediting the testimony of Officer Webster because it "lacked the hallmarks of believability because it was so internally inconsistent."

Viewing the evidence and all reasonable inferences derived therefrom in favor of the State as the prevailing party, we do not believe that the circuit court's findings were clearly erroneous regarding the "home visit" and Officer Webster's ability to see the "ketamine" label through the bag. To be sure, Detective Porter's and Officer Webster's testimony with regard to whether the initial intrusion was a "home search" or an "administrative search" was contradictory. Detective Porter, who had accompanied probation and parole officers on

"four or five" occasions, repeatedly characterized the visit to appellant's home on October 18, 2002, as an "administrative search" or a "search." He also testified, "I think they [, the probation officers,] looked in ah, closets ah, I believe and I believe they opened up ah, cupboards and drawers."

On the other hand, Officer Webster, who conducts approximately thirty home visits per week, testified that "there was no search, it was a home visit." He did not remember opening doors, closets, or cupboards. Not only had Officer Webster conducted far more home visits with probationers, but as a probation and parole officer, he is presumably more familiar with the Division of Correction regulations concerning "home visits" and "administrative searches," than Detective Porter, who is a Delaware State Police Officer.

Officer Webster's testimony that the intrusion was a valid "home visit" was somewhat supported by appellant's own testimony. Although appellant repeatedly characterized the intrusion as a "search," he testified that Officers Webster and Thompson requested Emma Volkomer to escort them around the home and "order[ed] her to open up cabinets and ... a little cupboard underneath the stairs ... they didn't like lift the couch up and look under stuff like that...." Appellant's testimony was consistent with Officer Webster's description of the scope of a home visit.

Accordingly, we are not persuaded that the circuit court erred in crediting the testimony of Officer Webster over that of Detective Porter on the issue of whether the initial intrusion began as, and was conducted within the scope of, a valid home visit.

Even if the initial intrusion into appellant's home was, in fact, an "administrative search" conducted in violation of procedures established by the Delaware Division of Correction, the analysis, but not necessarily the result, changes. In *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the Supreme Court held that a warrantless search of a probationer's home, which was conducted pursuant to an administrative regulation substantially similar to the Delaware

Division of Correction regulation governing "administrative searches," did not violate the probationer's Fourth Amendment rights. The *Griffin* Court declined to adopt a bright line rule that a warrantless search of a probationer's home was valid so long as the law enforcement officers had "reasonable grounds" for the search. *Id.* at 872, 107 S.Ct. 3164. Rather, the Court determined that the search was valid because the administrative regulation supporting the search satisfied "the Fourth Amendment's reasonableness requirement under well-established principles." *Id.* at 873, 107 S.Ct. 3164.

Subsequent to *Griffin,* however, the Supreme Court in *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), held that law enforcement officers need only possess a reasonable suspicion that a probationer is engaged in illegal activity in order to conduct a warrantless search of a probationer's home. Therefore, even if the initial intrusion into appellant's home exceeded the permissible scope of a home visit, so long as the officers conducting the intrusion possessed a reasonable suspicion that appellant or Emma Volkomer were engaged in illegal activity, the intrusion would not have violated their Fourth Amendment Rights. In that instance, although the intrusion may have violated the Delaware Division of Correction's regulation, which appellant concedes was created in accordance with *Griffin,* the evidence would not be subject to suppression pursuant to the exclusionary rule. The exclusionary rule is a judicially created mechanism to deter Fourth Amendment violations by those charged with ferreting out crime, not violations of law enforcement protocol. *See Michigan v. Tucker,* 417 U.S. 433, 439, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (holding that a suspect's rights were not violated and that inculpatory statements made by him to police were admissible even though the police "violated . . . the prophylactic rules developed to protect [the suspect's rights]"); *Ferguson v. State,* 301 Md. 542, 547–48 n. 2, 483 A.2d 1255 (1984) ("[T]he exclusionary rule . . . [is] a judicially imposed sanction for *violations of the [F]ourth [A]mendment* against unreasonable searches and seizures in state prosecutions"). In light of our conclusion that the circuit court did

not err in crediting Officer Webster's testimony that he abided by the reasonable procedures established by the Delaware Division of Corrections in executing a home visit, we need not decide whether the officers possessed a reasonable suspicion sufficient to justify a more intrusive search of appellant's home under *Knights.*

■ Detective Porter's and Officer Webster's testimony with regard to the discovery of the bag of ketamine was also somewhat different, but not irreconcilable. Detective Porter testified that "I think it was [Officer] Webster and ah, [I] gave him the bag and he looked in the bag." Detective Porter also stated that he could not read the labels of the ketamine until the bag was opened. On the other hand, Officer Webster testified that he believed that he was the first to pick up the bag, but in any event, before the bag was "moved" he could see through the bag and read that the boxes inside were labeled "ketamine."

Regardless of which officer first touched the bag, if Officer Webster could read the labels inside before the bag was moved, as the trial court believed he could, he would have obtained probable cause to believe that the bag contained evidence of a crime, namely the burglary of the Winterplace Animal Hospital. Therefore, the officers could seize the bag under the plain view exception to the warrant requirement. *See Wengert v. State,* 364 Md. 76, 88–89, 771 A.2d 389 (2001) (explaining that, where an officer's initial intrusion is lawful and the officer observes an object that he or she has lawful access to, which is apparently incriminating, the officer's warrantless seizure of the object is reasonable under the Fourth Amendment). That Detective Porter could not also see through the bag is of no consequence.

**JUDGMENT OF THE CIRCUIT COURT FOR CAROLINE COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**